11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Michael Edward Marsh

Appellant

Vs.                   No.
11-00-00250-CR  -- Appeal from Dallas
County

State of Texas

Appellee

 

The jury
convicted Michael Edward Marsh of indecency with a child, assessed his
punishment at confinement for four years, and recommended that he be placed on
community supervision.  The trial court
placed appellant on community supervision for a period of 10 years, subject to
conditions which included 180 days of confinement in the county jail,
registration as a sex offender, and no contact with anyone 17 years of age or
younger.  We affirm.

                                                                Background
Facts

Appellant
was a track coach and teacher at Mesquite High School, and complainant was a
16-year-old female student at the school. 
The principal issues at trial were whether appellant touched complainant=s Abreast@ and, if so, whether the touching was done Awith intent to arouse or gratify@ his sexual desire.  The State called several former students to prove other acts of
bad conduct by appellant.  

One of the
principal issues on appeal is whether the testimony of those former students
should have been excluded under TEX.R.EVID. 404(a)[1]
or if it was properly admitted under TEX.R.EVID. 404(b)[2]
to show appellant=s
motive, opportunity, intent, and plan. 
The trial court also ruled under TEX.R.EVID. 403 that the probative
value of the evidence was not Asubstantially outweighed@ by the danger of unfair prejudice. 








                                                                   Points
of Error

Appellant
presents 11 points of error.  First, he
argues in Point of Error No. 1 that the evidence is Alegally@ insufficient to prove that he acted with the intent to arouse and
gratify his sexual desire and in Point of Error No. 2 that the evidence is Afactually@ insufficient to prove that he acted with that intent.  Appellant then argues in Point of Error No.
3 that the evidence is  Afactually@ insufficient to prove that there was Acontact between [his] hand and [her] breast.@

In Points
of Error Nos. 4, 5, 6, 7, 8, and 9, appellant argues that the trial court erred
by permitting  the Aextraneous offense@ testimony; in Point of Error No. 10 that the
trial court erred in providing the jury with an excerpt of testimony from the
police officer; and in Point of Error No. 11 that the trial court abused its
discretion by Alimiting@ the testimony which was provided to the jury.

                                                             Sufficiency
of Evidence

Complainant,
C.P.A., testified that she was 17 years old at the time of trial; that she was
a senior at Mesquite High School; that she first met appellant when he was a
teacher-coach at the middle school which she attended; that, during her junior
year in high school, she had one class in a portable building near the portable
building where appellant taught; that she would see him on her way to and from
her sixth period class; that there would be a lot of visiting between classes;
that she and appellant would give each other a hug; and that those hugs were Amutual@ and Aokay@ with her.  Complainant also
testified that, just before the Thanksgiving break, appellant gave her a moth
in a ziplock bag because she was thinking about becoming a doctor or a
veterinarian, that she wrote him a Athank-you@ note
for giving her the moth, and that at that time she Areally liked@ appellant.  








Complainant
then testified that, before the second semester began, appellant=s hugs started getting longer and that, when
she was ready to let go, Ahe wasn=t.@  Complainant said the hugs started
Afeeling a little strange.@ 
Complainant testified that, after the second semester began, appellant
asked her to go home with him; that she Ajust kind of laughed it off@; that he called her Aa chicken@; that
appellant mentioned something about her Alooking cute pregnant@; and that she felt like appellant was Aflirting@ with her. 
Complainant also testified that one day, when she told him that she was Ahaving a really bad day,@ appellant 
began to give her a massage while there were Apeople all around@; that he Astarted moving lower and lower@ until he was right on the top of her breast; that she walked off; that
it Awas really weird@; that she tried to ignore the massage thing;
and that appellant asked her to write him a note.  Her testimony on direct examination by the prosecutor continued
in relevant part as shown:

Q: What
kind of note did he want you to write?

 

A: I said,
AWhat for?@ [And he said]: AWell, write about the massage that you owe me since you walked away.@

 

                                                           *    *   
*

 

Q: [D]id
you ever give [him a note saying that you would give him a massage]?

 

A: I gave
it to him the next day before sixth period.

 

                                                            *   *  
*

 

Q: What
happened after sixth period?

 

A:  After sixth period I saw him as normal and
had a conversation, walked him to his car. 
And he said that the note wasn=t juicy enough for him.

 

Q: Were
those his words, Ajuicy
enough@?

 

A: Yes.

 

                                                            *   *  
*

 

A:
Yes.  I wrote him a note telling him
that he was making me feel uncomfortable and that since it was so rare that I
am uncomfortable around people, that it was making me concerned.

 

Q:
Okay.  Once you did that did things
stop?

 

A:
No.  I gave him that note right before
sixth period.  After seventh period he
came up to me and was like, ASo what you are saying, you rather do it in person?@

 

                                                           *    *   
*

 

Q: How did
you [handle the situation]?

 

A: I wrote
a note to Mr. Richardson, our vice principal.

 








                                                            *   *  
*

 

Q: [R]ead that to the
jury, please.

 

A: AMr. Richardson, I am giving you a copy of a
letter given to Coach Marsh from me.  In
doing so I am trusting you that you will keep it confidential unless otherwise
instructed by me.  He has been a great
friend to me just as you are but he has [been] taking it a bit too far.@

 

AI wrote him a previous note saying almost
exactly what the enclosed note says. 
This time if the problem still persists I will come to you in person
with my copy of the note.  If it does
not persist I will simply tell you that everything is better and then you can
toss the note.@

 

AIf you want any further info, let me
know.  Thank you for allowing me to
trust you.  Sincerely, [complainant].@

 

                                                            *   *  
*

 

Q: The second one, could
you read the note to Coach Marsh, please?

 

A: ACoach Marsh, I have done quite a bit of
thinking lately and when I started to think about you lots of questions went
through my mind.  First of all, I don=t mean for you to get the wrong
impression.  By that I mean our friendship
isn=t exactly a conventional student-teacher
relationship.@

 

AI hope I=m not the only one seeing that situation that way.  Now, in some ways I wouldn=t mind the situation accelerating but in
other ways I=m not so sure.  You are a wonderful man and you are incredibly sweet.  And I can remember your sense of humor all
the way back to the seventh grade at Agnew [Middle School].@

 

AI do plan on being on the track team my
senior year next year.  When I do I want
to be comfortable around you.  I=m not at the point where I am uncomfortable
around you.  I don=t want it to get that way.  Love always, [complainant].@

 

Q: There=s an asterisk at the bottom.  What is that?

 

A: It says, AThink about this note.@

 

Q: At the top you have in
parentheses, AI got my DL. 
Yea.@  What
did you mean by that?

 








A: Well, at the time
before I wrote this I was in driving school and I was really excited about
it.  He told me to let him know when
I got my driver=s
license so I would be able to drive over to his house.

 

Q: What was your purpose
in giving this note to Mr. Richardson?

 

A: Because I knew that if
it did get any further I would want somebody above me as a student to be able
to say something about it, say I didn=t just make it up.

 

                                             CROSS-EXAMINATION

 

Q: [DEFENSE COUNSEL]: You
said that at some point you began to be afraid; is that correct?

 

A: Yes, sir.

 

Q: When was that?

 

A: After he started
making comments to me and...said I was going to give him a massage...and said
[the note] wasn=t juicy enough for him.

 

                                                            *   *  
*

 

Q: On that date on
January 21st when you claim he gave you the massage was he by himself or were
there other students?

 

A: When he gave the
massage there were other students around.

 

                                                            *   *   *

 

Q: And you said that at
some point you felt the massage went over long and he began to move his hands
down to the top part of your chest; is that correct?

 

A: Yes.

 

Q: Would you show me with
the flat of your hand how far down your chest he came?

 

A: Right here, right
there.

 

Q: Okay.  Did he actually cup your breasts in any way?

 

A: No.








Q: Okay.  Did he rub his hands on your breasts in any
way?

 

A: Yes.

 

Q: So he actually
rubbed his hands back and forth on your breasts?

 

A: Yes, right here and
then I walked away.

      

                                           REDIRECT
EXAMINATION

 

Q: What about what were
you thinking when [appellant] was massaging your shoulders and your breasts?

 

A: I was like, AOh, my gosh. 
This teacher is touching my boobs.@ (Emphasis added)

 

Complainant=s
testimony, when considered with the Aextraneous offense@ testimony discussed under Points of Error Nos. 4 through 9, is
sufficient to prove that appellant=s indecent contact was intentional (not done by accident or mistake)
and that the touching was done with the intent to gratify his sexual desire, as
part of his plan to seduce her. 
Complainant=s
testimony is also sufficient to show that appellant=s hand touched her breasts because Aflesh-to-flesh contact@ is not required to prove an indecent touching.  See, e.g., Resnick v. State, 574 S.W.2d 558,
560 (Tex.Cr.App.1978).  

The evidence is Alegally@ sufficient under the test stated in Jackson
v. Virginia, 443 U.S. 307 (1979).  See
also Margraves v. State, 34 S.W.3d 912, 917 (Tex.Cr.App.2000).  The evidence is Afactually@ sufficient under the test stated in Clewis v. State, 922 S.W.2d 126,
129 (Tex.Cr.App.1996).  See also Wilson
v. State, 7 S.W.3d 136, 141 (Tex.Cr.App.1999). 
The jury is the exclusive judge of the credibility of the witnesses and
of the weight to be given to their testimony. 
Margraves v. State, supra; Barnes v. State, 876 S.W.2d 316, 321
(Tex.Cr.App.), cert. den=d, 513 U.S. 861
(1994).  Points of Error Nos. 1, 2, and
3 are overruled. 

                                   Testimony
About AExtraneous@ Bad Acts








Appellant
argues in Points of Error Nos. 4 and 6 that the trial court erred in admitting
into evidence proof of his sexual relationships with L.H. and with L.F.  Appellant also argues in Points of Error
Nos. 5 and 7 that the probative value of the testimony about appellant=s sexual relationships with L.H. and with
L.F. was substantially outweighed by the danger of unfair prejudice.  Appellant argues in Point of Error No. 8
that the cumulative effect of the admission of testimony from L.H., L.F., and
other former students about Asexual misconduct and inappropriate sexual behavior@ constituted reversible error.  Appellant argues in Point of Error No. 9
that the cumulative effect  of the
testimony by L.H., L.F., and other former students was Ahighly prejudicial@ and amounted to reversible error.  

L.H. was
25 years old at the time of trial.  She
testified that appellant was her track coach during her last two years in high
school and that she was 17 years old the first time he massaged her
shoulders.  They later entered into a
sexual relationship.  She would skip
school and go to his apartment where they would have sex.  L.H. testified that appellant was Avery forward and suggestive@ and that he Ainitiated the relationship in every way@ while she was in high school. 
She also testified that, Aat the time,@ she
was happy to be in the sexual relationship with him.  The relationship started with him fondling her breasts and
fondling her vagina, and Athen it became more oral sex.@  They later had sexual
intercourse Abefore a work-out.@  This
relationship continued until she finished high school and into her college
years.  It ended when he got engaged and
then started again after the separation before his divorce.    

L.F. was
22 years old at the time of trial.  She
was 17 years old when she met appellant at Mesquite High School.  She said that appellant would give her Areal tight@ hugs at school.  After she
broke up with her boyfriend, appellant gave her his telephone number and told
her: AIf you need someone to talk to, you know I=m here for you.@  He offered to help her get
into better shape, and she was flattered that a coach would be interested in
her.  When she was 18 years old, he took
her out to eat, and then they went to his apartment.  Appellant started by rubbing her shoulders, and then Aone thing led to another.@ 
Appellant Agave
[her] oral sex.@ 
Appellant asked her if she wanted to come to bed with him, and she
stopped because she Adidn=t feel right.@  








M. G. was
17 years old at the time of trial.  She
was a friend of complainant while they were students at Mesquite High School,
and she identified the notes which were written back and forth between the two
of them while appellant was making complainant uncomfortable.  Those notes were introduced into evidence at
trial.  M.G. said that she told
complainant to tell appellant to Aknock off what he was doing@ or that she was going to tell the principal on him.  M.G. said that complainant was Astruggling with this.@  

K.A.D. was
16 years old at the time of trial.  She
and complainant were friends in the tenth grade.  K.A.D. said that she told complainant Ato take action@and to notify someone who could Aactually do something about it.@  K.A.D. said that complainant
was talking about appellant.

Marsha Lee
Glenn was a high school teacher.  Before
her present teaching assignment, she taught at Mesquite High School.  Glenn testified that complainant had a
conversation with her about why she did not want to leave the portable
classroom until appellant had passed. 
Glenn testified that complainant said that: A[H]e put his hands on her, that he couldn=t keep his hands off other girls and it
grossed her out.@  

J.N.K. was
20 years old at the time of trial. 
Appellant was her cross-country track coach while she was a student at
Mesquite High School.  During her senior
year, he wanted to take her out to eat. 
She had a tongue ring at that time, and he was talking about it.  He said: AI heard that=s good
for oral sex.@  When
she said that she did not know, he said: AWhy don=t you try it out on me.@  This
conversation was in front of his portable classroom.  J.N.K. testified on cross-examination that appellant never
grabbed her breasts, that he did not give her any massages, and that he never
asked her to come to his house.

J.D. was
20 years old at the time of trial.  She
quit Mesquite High School when she was 16 years old.  Appellant was her track coach. 
At first she thought appellant was a great guy, but then she got
uncomfortable with him.  He would say Agood job,@ and he would Apat
[her] on the rear@ when
she ran across the finish line.  J.D.
also testified that appellant would Aslide his hand over [her] breast@ and that it would make her uncomfortable.  J.D. testified that she quit school because she was Auncomfortable@ seeing appellant in the hallways.

E.R.S. was
17 years old at the time of trial. 
Appellant was her track coach at Mesquite High School.  When she was 15, appellant asked her to
write him notes and to make them Ajuicy.@ 
E.R.S. testified that one morning she and another 15-year-old friend
were at the stadium to practice.  They
saw appellant, and he put a grape in Aone of [their] mouths.@  They noticed that Ahe had a hard on.@  On
cross-examination, E.R.S. testified that appellant never touched her breasts
and never gave her a massage.








N.M.G. was
18 years old at the time of trial.  When
she was a sophomore at Mesquite High School, appellant was one of her
teachers.  One day, she wore a long
dress to school, and appellant looked at her from her Ahead to toes@ and said: AYou
look sexy today.@  She
said that he looked at her like a teenage boy would look at her.  On cross-examination, she testified that he
did not massage her or ask her to write him notes.  She also said that appellant had her removed from his class after
she talked to the school office about the comment he made about her dress.

Catherine
Bauer was a teacher at Mesquite High School. 
She testified that appellant was Aoverly friendly with the female students,@ that he would put his arms around them, and that he would rub their
backs.  

Norma
Joyce Cruson was a teacher at Mesquite High School.  She testified that, when she had the duty to watch the halls, she
saw appellant interact with female students in an inappropriate way.  For example, Apulling a student close to him, looking at her in the face and getting
really serious,@ when the girl was not wanting to have eye
contact with him and trying to avoid him. 
She saw him do that with more than one girl.  She also heard him say to a female student: ALooking hot today.  Looking fine.  Want some
of that.@  On
cross-examination, she said that she had seen him hug students but that she had
not seen him massage students.  

The trial
court gave the following instruction to the jury before testimony by L.H. and
again before testimony by L.F.:

Ladies and
gentlemen of the jury, you are instructed that if there is testimony regarding
the defendant=s having committed bad acts other than the
offense alleged against him in the indictment in this case, you cannot consider
said testimony for any purpose unless you find and believe beyond a reasonable
doubt that the defendant committed such other bad acts, if any were committed,
and even then you may only consider the same in determining the intent,
opportunity, plan or scheme of the defendant, if any, in connection with
the offense alleged against him in the indictment in this case and for no
other purpose.  (Emphasis added)

 

That instruction was also
included in the court=s
written ACharge of the Court@which was given to the jury.    








The trial
court did not err by admitting into evidence proof of appellant=s sexual relationship with L.H. and proof of
his sexual relationship with L.F.  The
cumulative effect of the admission of that testimony, together with testimony
by the other former students, did not constitute reversible error.  Even though this testimony was prejudicial
to appellant=s defense, its probative value was not Asubstantially outweighed@ by the danger of  Aunfair prejudice.@ 
Points of Error Nos. 4, 5, 6, 7, 8, and 9 are overruled.

                                                          Testimony
Read to the Jury

During its
deliberations on the first phase of trial, the jury sent a note to the court
saying: AThe panel is in conflict regarding the
definition of >breast area.=  Request reading from
testimony.@  The
jury=s note also said that there was a conflict on
complainant=s testimony as to Ahow far down@ appellant=s
hands went and as to what she said (whether she used the word Aboobs@).  The trial court had the
court reporter type this portion of the testimony and sent it to the jury:

[DURING CROSS-EXAMINATION OF DETECTIVE SHANE
CANNON BY DEFENSE COUNSEL]:

 

A: What I
am saying and what I told the grand jury, top of her breasts which is under the
neck bone here and lower down onto her breasts which is all considered the
breast area, according to the encyclopedia.

 

[DURING DIRECT EXAMINATION OF COMPLAINANT BY
ASSISTANT DISTRICT ATTORNEY]:

 

Q: Tell
them what happened.

 

A: And
somehow I got turned around.  I don=t know if I did it or he did it,
whatever.  But he started giving me a
massage and then he started moving lower and lower until he was right on the
top of my breast and I walked off.

 

Q: When he
was giving you a massage where was he touching at first?

 

A: He
started on the top of my shoulders.

 

Q: Then
you said he went lower and lower.  Was
he going down the front of - - the front of your chest to your breast?

 

A: Yes.

 

Q: Did he
in fact touch your breast?

 

A: He
touched the top of my breast, yes.

 

Q: Was he
massaging when he did that?








A: Yes.

 

Q: Did you stand
there?  What did you do?

 

A: I walked off.  (Emphasis added)

 

[DURING RECROSS EXAMINATION OF COMPLAINANT BY
DEFENSE COUNSEL]:

 

Q: Now, ma=am, would you stand over here in front of the
jury?  Would you move your hands on a
flat plane down to the lowest point where [appellant] had any contact with your
dress or clothing?

 

[PROSECUTOR]: I ask her
[to] take her coat off for the demonstration.

 

THE COURT: If you would
do so.

 

A: (Removes coat) Right
here.

 

Q: Thank you, ma=am. 
You may re-take your seat.

 

[PROSECUTOR]: May the
record reflect that was on the child=s breast right above the nipples.

 

[DEFENSE COUNSEL]: I
object to that.  I think they=re asking the Court to comment on the
evidence.

 

THE COURT: The record
will reflect only what the record reflects.

 

[REDIRECT EXAMINATION OF COMPLAINANT BY
PROSECUTOR]:

 

Q: What were you thinking
when he was massaging your shoulders and your breasts?

 

A: I was like, AOh, my gosh. 
This teacher is touching my boobs.@

 








Appellant=s trial counsel objected when the court
showed counsel the testimony which was transcribed and sent to the jury.  The trial court overruled that objection, on
its interpretation of the jury=s note as showing that the jury was Ain conflict@ as to
testimony regarding the definition of Abreast area.@  The court said: A[T]hat is exactly what the testimony is, is a
definition of >breast area.=@    Appellant=s trial counsel also made an Aadditional objection@ to the last portion of Detective Cannon=s testimony which said: A[A]ccording to the encyclopedia.@  The
court ruled that: AAs
that was part of the answer, your...objection is overruled.@  The
trial court did not abuse its discretion in deciding the area of the jury=s disagreement and in furnishing the jury with
the transcribed testimony which is quoted. 
See and compare: Robison v. State, 888 S.W.2d 473, 480-81
(Tex.Cr.App.1994), cert. den=d, 515 U.S. 1162 (1995); Brown v. State, 870 S.W.2d 53, 55
(Tex.Cr.App.1994).  Point of Error No.
10 is overruled.

                                              Requested
Testimony Not Read to the Jury

Appellant
argues in his final point of error that the trial court erred in not giving the
jury testimony by K.A.D. about what complainant told her about where appellant
had touched her.  The jury had requested
complainant=s testimony Aon the massage - how far down hands went before she left.@  The
jury did not request other witnesses= testimony about what complainant had told them.  The trial court did not abuse its discretion
in refusing to submit the testimony from K.A.D.  Point of Error No. 11 is overruled.

                                                                This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

BOB
DICKENSON

            SENIOR JUSTICE      

 

September 20, 2001

Do not publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of:  Arnot, C.J., and 

McCall, J., and Dickenson, S.J.[3]











[1]Rule 404(a) provides that evidence of a person=s character is not admissible for the purpose of Aproving action in conformity therewith@ with certain exceptions, including those listed in
Rule 404(b).





[2]Rule 404(b) provides that evidence of other Acrimes, wrongs, or acts@
may be admissible to prove Amotive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident.@





[3]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.